**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

DWAYNE SEALS,

      Plaintiff,

v.                                 Case No. 20-11272

WAYNE COUNTY and WAYNE
COUNTY EMPLOYEES'
RETIREMENT SYSTEM, ~~and
ROBERT GRDEN, in his individual
Capacity~~,

      Defendants.
_____/

**OPINION AND ORDER DENYING DEFENDANT WAYNE COUNTY EMPLOYEES'
RETIREMENT SYSTEM'S MOTION FOR SUMMARY JUDGMENT (ECF No. 52) AND
GRANTING DEFENDANT WAYNE COUNTY'S MOTION FOR SUMMARY
JUDGMENT (ECF No. 54)**

This case concerns a First Amendment retaliation claim under 42 U.S.C. § 1983

brought by Plaintiff Dwayne Seals ("Mr. Seals") against Defendants Wayne County

("County"), Wayne County Employee's Retirement System ("WCERS"), and Robert

Grden ("Mr. Grden"), the director of WCERS, in his individual capacity.[1] (*See* Amended

Complaint, ECF No. 5.) Currently pending before the court are two motions for summary

judgment, one filed by the Defendant County and a joint motion by Defendants WCERS

and Mr. Grden. (ECF No. 54; ECF No. 52.) The motions have been fully briefed. It

should be noted, however, that Mr. Grden has since been dismissed from the case with

---

[1] Plaintiff also presented two state law claims, which have since been dismissed without prejudice due to concerns about jury confusion and the raising of novel and complex state law issues that could predominate over the federal issues. (ECF No. 25.)

prejudice, pursuant to a stipulation between the parties. (ECF No. 59.) Upon review of the parties' filings, the court concludes that single opinion and order is appropriate to resolve both motions. Furthermore, a hearing is not necessary. *See* E.D. Mich. LR 7.1(f)(2). For the reasons explained below, the court will deny Defendant WCERS's motion for summary judgment (ECF No. 52) and grant Defendant Wayne County's motion for summary judgment (ECF No. 54).

## I. BACKGROUND

The following facts appear to be undisputed.[2] In November of 2016, Mr. Seals retired from his position as Chief Financial Advisor for the Wayne County Commission. (ECF No. 52, PageID.966–67; ECF No. 54, PageID.2137; ECF No. 58, PageID.2280.) Thereafter, he began receiving approximately $5,415.00 in monthly pension benefits from WCERS. (Id.) Almost immediately, Mr. Seals took issue with how WCERS calculated his pension benefits, specifically the average final compensation (AFC) figure used. (*See* ECF No. 52-2, PageID.1109–10.) He formally appealed the same to WCERS's board. (Id.) At its January 30, 2017 Regular Meeting, WCERS considered and denied Mr. Seal's appeal. (Id.) Despite the denial, Mr. Seals continued to dispute the AFC computation, sending a total of four emails in February and March of 2017 to various WCERS and County staff. (ECF No. 52-2, PageID.1094, 1120, 1178–79; ECF No.52-5, PageID.2063–64.) Though it is unclear exactly when during this period, after meeting with Mr. Seals and reviewing the relevant calculations, Mr. Grden determined

---

[2] The court's analysis is complicated by Defendant WCERS's failure to adequately adhere to the court's motion practice guidelines with respect to statements of material facts, as set forth in the court's May 18, 2021 "Scheduling Order (Jury)." (ECF No. 35.) The court appreciates Defendant County's compliance in this regard and further understands Plaintiff's non-compliance.

that Mr. Seals was entitled to some increase in his AFC. (ECF No. 52-2, PageID.1085–
86.) Mr. Seals' pension benefits were adjusted accordingly. (Id.)

Somewhat simultaneously, the Wayne County Register of Deeds, Bernard
Youngblood, offered Mr. Seals an appointed position within his office as "Deputy
Register of Deeds/Chief Financial Officer" in early 2017. (ECF No. 58, PageID.2281.)
Before accepting the position, however, Mr. Seals specifically discussed with Mr.
Youngblood whether he could return to full-time employment at the County while still
receiving his pension benefits. (ECF No. 52-3, PageID.1258–59.) Mr. Youngblood
believed he could. (Id.) Mr. Seals further conferred with representatives of the Wayne
County Corporation Counsel's office, Bruce Campbell and Kevin Kavanaugh, who also
confirmed that the appointed deputy register of deeds position would not interfere with
Mr. Seals' collection of his full pension. (Id. at PageID.1260–61.) Armed with this
information, Mr. Seals accepted the Deputy Register of Deeds/Chief Financial Officer
position.

In determining that Mr. Seals was still eligible to draw on his pension, the
Corporation Counsel's office specifically concluded that Mr. Seals' position fell into an
exception to Mich. Comp. Laws § 46.12a(28)—colloquially referred to as the "thousand-
hour rule." (ECF No. 52-5, PageID.1968.) The thousand-hour rule requires a Michigan
county to suspend pension benefits for retired employees who, if reemployed by the
county, work more than one thousand hours in one year. *See* Mich. Comp. Laws §
46.12a(28). However, the statute includes specific exceptions, including one "[f]or a
retirant who was not an elected or appointed county official at retirement, [and] *is
[subsequently] elected or appointed as a county official* for a term of office that begins

3

after the retirant's retirement allowance effective date." Mich. Comp. Laws § 46.12a(28)(b)(i)(B) (emphasis added). Under this appointed official exception, Mr. Seals continued to receive his pension benefits during the entire time he held the Deputy Register of Deeds/Chief Financial Officer position. (ECF No. 52-5, PageID.1967–68.) At the request of WCERS, the Corporation Counsel's conclusion was memorialized in an advisory opinion, produced by Corporation Counsel Drew Van de Grift. (Id.)

The County also maintains a policy with respect to the thousand-hour rule titled "Retirants Returning to Wayne County Employment." (ECF No. 52-2, PageID.1145–49.) In relevant part, the policy tasks the Department of Personnel/Human Resources (P/HR) to conduct a pre-hire review of all employment applications and to "determine if the candidate is exempt from the 1,000 hour rule." (Id. at PageID.1147.) "If the position considered is one needing further determination, on a case by case basis, P/HR staff must consult a director or above to request a legal opinion." (Id.) Payroll staff are further charged with "notifying WCERS staff, via email, of re-employment of a retiree at the time of rehire." (Id. at PageID.1148.) The P/HR Payroll Manager is responsible for reviewing a bi-weekly report of those employees who have worked at least 840 hours and notifying employees of their hour status. (Id.) Upon a retiree working beyond 1,000 hours, the P/HR Manager or designee forwards a report detailing the same to WCERS staff. (Id.) WCERS is then tasked with sending a suspension letter to the employee. (Id.)

In May of 2019, Mr. Seals resigned from the Register of Deeds office. (ECF No. 52-3, PageID.1265; ECF No. 54, PageID2199.) However, by July of 2019, he was re-employed with the Wayne County Clerk's Office. (ECF No. 52-2, PageID.1028.) Specifically, Wayne County Clerk Cathy M. Garrett appointed Mr. Seals as her "Deputy

County Clerk/Financial Officer." (Id.) Ms. Garrett swore Mr. Seals in as her deputy in the same manner and under the same procedures that she has used during her entire 21-year tenure as County Clerk. (ECF No. 52-5, PageID.2001.) This process did not include approval by a circuit court judge or a filing with the County Treasurer's office. (Id. at PageID.2016–17.)

Prior to hiring Mr. Seals, Ms. Garrett was aware of his ability to work full-time with the Register of Deeds while still receiving his pension. (ECF No. 52-5, PageID.2004.) The two discussed whether the same arrangement would be able to continue for the Clerk's Office position. (Id.; ECF No. 52-3, PageID.1268–69.) Ms. Garrett tasked her Chief Deputy Clerk, Patricia Ways, with confirming Mr. Seals' continued pension eligibility with P/HR. (ECF No. 52-5, PageID.2004.) Ultimately, it was both Ms. Garrett and Mr. Seals' understanding that he would continue receiving his pension benefits as an exempt re-employed retiree under the thousand-hour rule. (Id.; ECF No. 52-3, PageID.1269.) This understanding was shared at the time by P/HR Department Administrator Beatrice Golden, WCERS Retirement Benefits Department Manager Felicia Hollis, and Director of P/HR Steve Mahlin. (ECF No. 58-17.) No one involved in Mr. Seals' rehiring contacted Corporation Counsel to confirm his continued pension eligibility. (*See* ECF Nos. 58-17 & 58-19.)

However, in December of 2019, WCERS determined that Mr. Seals' position with the Clerk's Office did not qualify for statutory exemption from the thousand-hour rule. (*See* ECF No. 52-2, PageID.1131–32; ECF No. 58-19; ECF No. 58-20.) On January 17, 2020, Mr. Seals was made formally aware of the decision by Mr. Mahlin in his capacity as the County's P/HR Director. (ECF No. 58-22.) Thereafter, P/HR staff sent emails to

Mr. Seals on January 29, 2020 and February 12, 2020, relaying his number of hours worked and his proximity to the thousand-hour limit. (ECF No. 52-2, PageID.1041–43.) At its February 24, 2020 Regular Meeting, WCERS resolved to suspend Mr. Seals' pension benefits, based on—among other things—"the legal opinions from Corporation Counsel and [VanOverbeke, Michaud & Timmony, P.C. ("VMT")] that the position of Deputy County Clerk/Financial Officer is not a position exempt from the 1,000 hour limitation of MCL 46.12a(28)." (ECF No. 52-2, PageID.1054.) On February 27, 2020, on behalf of WCERS as its special counsel, VMT sent Mr. Seals a letter, detailing the basis for his pension suspension and notifying him of his appellate rights. (ECF No. 52-2, PageID.1141–43.) Mr. Seals initiated an appeal before WCERS that WCERS ultimately resolved to deny at its May 29, 2020 Regular Meeting. (ECF No. 52-2, PageID.1067–74.) In the interim, on April 17, 2020, Mr. Seals filed the present lawsuit.

Critical to the resolution of this case are the events that transpired between July of 2019 and December of 2019. While the parties may agree that certain events occurred throughout this time period, they vehemently diverge in their characterization of those events. Nonetheless, it is undisputed that after lodging a series of complaints regarding the calculation of his pension benefits in 2016 and 2017, Mr. Seals did not correspond with or speak out publicly against WCERS until July 29, 2019, when he participated in the public comment portion of the WCERS Regular Meeting.[3] (See ECF

---

[3] WCERS and the County advocate for the acknowledgement of emails sent by Mr. Seals in 2014, which they characterize as the true start of Mr. Seals' complaints against the WCERS board. (See ECF No. 52-2, PageID.1011–13.) While they generally could be taken as complaints regarding WCERS, Mr. Seals' focus appears to be an issue with the characterization of his Sumpter Township benefits package, which differs in kind from his AFC calculation complaints in 2016. Further, Mr. Seals was not in a position to retire yet, doing so two years later. With that said, their existence is undisputed.

Nos. 58-12 & 58-14.) During that time period, Mr. Seals also sent two emails. The first

was sent on September 30, 2019, in response to the WCERS Regular Meeting held that

day wherein, during a closed session, WCERS resolved to receive and file a

confidential legal report from VMT and further authorized VMT to send correspondence

to Mr. Seals regarding the calculation of his pension benefits. (ECF Nos. 58-13, 58-14,

& 58-15.) WCERS further rejected any issue with Mr. Seals' pension calculations.

WCERS through special counsel VMT issued a letter to Mr. Seals dated October 1,

2019, detailing his complaint history and characterizing the September 30, 2019 email

as "threatened legal action." (ECF No. 58-14.) The second email by Mr. Seals was sent

on October 31, 2019 to Judge Richard Kaufman, an ex officio member of the WCERS

board and carbon copied Kevin Kavanaugh and Alisha Bell, another ex officio WCERS

board member. (ECF No. 58-16.) Mr. Kavanaugh then forwarded the email to Robert

Grden and Gerard Grysko, WCERS directors and County employees, later on the 31st

with the following message: "FYI – sounds like a plan." (Id.) Both of Mr. Seals' emails

made allegations that retirees as a group were being misled or cheated out of benefits

totaling as much as $200,000.00 to $300,000.00 annually. (ECF Nos. 58-13 & 58-16.)

Thereafter, on November 4, 2019, at the request of the WCERS board, Mr. Van

de Grift began to investigate whether Mr. Seals' position with the County Clerk's Office

qualified as exempt from the thousand-hour rule. (ECF No. 52-5, PageID.1969; ECF

No. 58-17.) The advisory opinion Mr. Van de Grift produced, after it was revised on

November 8, 2019 and December 9, 2019, was ultimately considered and adopted by

WCERS during its December 16, 2019 Regular Meeting. (ECF No. 52-2, PageID.1131–

32; ECF No. 52-4, PageID.1865.) At some unspecified point, special counsel VMT also

produced an opinion for WCERS' review, which WCERS considered in its February 24, 2020 decision to suspend Mr. Seals' pension benefits. (ECF No. 52-2, PageID.1071.)

### III. STANDARD

WCERS and the County (collectively "Defendants") bring their respective motions under Federal Rule of Civil Procedure 56(a), which requires the court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). As the movants, Defendants bear the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed) (quoting Fed. R. Civ. P. 56(e)). This requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere possibility of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). For a court to deny summary judgment, "the evidence [must be] such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. All reasonable inferences from the underlying facts must be drawn "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

To specifically survive a motion for summary judgment in a First Amendment retaliation suit, the non-moving party—here Mr. Seals—must "make a prima facie case

of retaliation, which comprises the following elements: '(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.'" *Dye v. Office of the Racing Com's*, 702 F.3d 286, 294 (6th Cir. 2012) (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir.2006)). "If [Plaintiff] establishes a prima facie case, the burden then shifts to [Defendants] to demonstrate 'by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct.'" *Id.* (quoting *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir.2010) (internal quotation marks omitted)). "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Eckerman*, 636 F.3d at 208. "Unlike in the *McDonnell Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims." *Dye*, 702 F.3d at 295.

## IV. DISCUSSION

Defendants both filed motions for summary judgment. Their arguments largely overlap. Unless specified otherwise, the court analyzes Defendants' arguments together. It should also be noted that the court has previously analyzed the major issues and arguments in this case in its denial of Defendants' motions to dismiss. (ECF No. 22.) Where appropriate, the court references and incorporates its prior findings.

### A. First Amendment Retaliation Claim

As previously stated, to establish a prima facie claim for first amendment retaliation, the plaintiff must allege that: "(1) [he] engaged in protected conduct; (2) an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by [his] protected conduct." *Maben v. Thelen*, 887 F.3d 252, 264 (6th Cir. 2018) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 395 (6th Cir. 1999) (en banc)). Here, the basis of Mr. Seals' retaliation claim involves his complaints to WCERS about an alleged discrepancy in its calculation of pension benefits that potentially shortchanged beneficiaries a total of $200,000.00 annually, both publicly during the public comment portion of the July 29, 2019 WCERS Regular Meeting and in private emails sent September 30, 2019 and October 31, 2019 respectively. (ECF Nos. 58-12, 58-13, 58-14, & 58-16.) This alleged protected conduct was then met with Mr. Seals' pension suspension, which he argues was retaliatory.

### 1. Protected Conduct

In its denial of Defendants' motions to dismiss, the court already considered and determined as a matter of law that Mr. Seals engaged in constitutionally protected speech in accordance with *Farhat v. Jopke*, 370 F.3d 580, 593 (6th Cir. 2004). (ECF No. 22.) As such, it will not repeat its analysis again here because Defendants have offered little to no substantively different arguments. WCERS chose to simply incorporate its argument from its motion to dismiss (ECF No. 13), while acknowledging that the court ruled on the issue already, so as to preserve an objection for appeal. For

its part, the County largely recycled its prior legal argument from its motion to dismiss (ECF No. 12), while making efforts to supplement with new evidence, specifically Mr. Seals' deposition testimony. However, though Mr. Seals was unable to recount with whom he conversed regarding their pension calculations or if the calculations were truly incorrect, those facts do nothing to change the court's determination that Mr. Seals' mixed speech primarily concerned public matters. (*See* ECF No. 22.) Here, when viewed in light most favorable to Mr. Seals, the alleged facts continue to suggest that the focus of his speech was on a matter of public concern. Again, Mr. Seals expressly stated that "the $38 a month that I'm losing is a very small amount for me, but if you look at the loss to retirees in their pension benefits, it could be as much as $200,000 to $300,000 a year." (ECF No. 52-2, PageID.1158.) Such a large miscalculation, if true, would qualify as a newsworthy example of government malfeasance. *See Handy*-Clay, 695 F.3d at 543 (quoting 547 U.S. at 425) (noting that "[t]he [Supreme] Court reiterated . . . in *Garcetti . . .* that '[e]xposing governmental inefficiency and misconduct is a matter of considerable significance'"). Thus, Mr. Seals has again satisfied his initial burden of showing that his speech primarily addressed a matter of public concern.

## 2. Adverse Action

Again, in its denial of Defendants' motions to dismiss, the court took up the issue of whether the suspension of Mr. Seals' pension benefits constituted an adverse action. (ECF No. 22.) The court found unequivocally that a reduction in monthly income of $5,415.00 due to an exercise of protected conduct would be enough to silence an ordinary employee, relying on *Buddenberg v. Weisdack*, 939 F.3d 732, 740 (6th Cir. 2019), and *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 710 (6th Cir. 2007). (*See*

ECF No. 22.) As with its argument on the first prong, WCERS acknowledged the court's prior ruling while preserving its objection for appeal. (ECF No. 52, PageID.990.) The County for its part made no argument, conceding that the suspension would qualify as an adverse action. (ECF No. 54, PageID.2148.) Mr. Seals has therefore again satisfied his initial burden of showing that his pension suspension was an adverse action.

### 3. Causation

More complicated is the causation component to Mr. Seals' retaliation claim. The issue of causation typically presents a "factual issue to be resolved by a jury." *Maben*, 887 F.3d at 267 (quoting *Harris v. Bornhorst*, 513 F.3d 503, 519–20 (6th Cir. 2008)). To meet the causation element of a First Amendment retaliation claim, a public employee must demonstrate (1) that an individual defendant proximately caused the adverse employment action and (2) that the individual defendant was "motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *King v. Zamiara*, 680 F.3d 686, 695 (6th Cir. 2012). The causal element requires the employee to "point to specific, nonconclusory allegations reasonably linking [his] speech to employer discipline." *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003) (internal quotations and citations omitted).

"A plaintiff successfully demonstrates a causal connection between the adverse action and the protected conduct by offering direct or circumstantial evidence indicating that the protected conduct was a substantial or motivating factor behind the adverse action against plaintiff." *Eckerman*, 636 F.3d at 208 (referencing *Kreuzer v. Brown*, 128 F.3d 359, 363 (6th Cir.1997)). "[T]emporal proximity alone can, in certain circumstances, suffice to show a causal connection in a retaliation case." *Dye*, 702 F.3d

12

at 305. However, "'where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.'" *Id.* at 306 (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 525 (6th Cir.2008)).

Defendants argue that Mr. Seals is unable to show a tenable connection, much less causation, between his campaign of complaints and the suspension of his pension benefits. (ECF No. 54, PageID.2148.) In so arguing, Defendants focus heavily on 2016 being the appropriate "starting point" for his purported protected activity, which would prevent Mr. Seals from wholly relying on a temporal connection in proving causation. Rather, because the alleged adverse action occurred more than three years later, Defendants contend Mr. Seals must produce "some other conditional evidence of malice." (Id. at PageID.2150.) They then conclude that he is unable to offer any evidence of animus and instead provide examples of an absence of animus on Defendants' part, including Mr. Grden's efforts to come to a resolution and the WCERS board's willingness to verify calculations after Mr. Seals' appeal opportunity passed. (ECF No. 52, PageID.993.) WCERS also specifically presents the commission's consistent treatment of other similarly situated employees subject to the thousand-hour rule, referencing the suspension of benefits for a former Corporation Counsel attorney. (Id. at PageID.996.)

Mr. Seals counters that he has presented sufficient evidence to create a genuine issue of material fact as to causation. Mr. Seals' argument is largely narrative, wherein he paints a picture of a collusive plot to suspend his benefits due to 90% of the WCERS

board being upset at his public comments.[4] (ECF No. 58, PageID.2303.) He relies

primarily on deposition from a WCERS board member, Tom Yee, who recused himself

from deliberations regarding Mr. Seals after a motion was made to investigate "the

feasibility of whether or not [the thousand-hour rule] could be used to take his pension

away." (ECF No. 58-5.) Mr. Seals contends that this alone stands in contrast to

Defendants' assertion that the WCERS board simply requested to see the analysis on

Mr. Seals' position within the Clerk's Office as it relates to the thousand-hour rule. (ECF

No. 52-2, PageID.1086.) Mr. Seals further relies on deposition testimony from Ms.

Garrett regarding her conversations post-suspension with P/HR staff, asserting that the

correspondence can be viewed as an attempt to oust him from his position, especially

considering P/HR's initial stance with respect to his eligibility. (ECF No. 58,

PageID.2292–93.) Mr. Seals also makes some attempt to counter Defendants' temporal

connection argument, emphasizing the lapse in time between his 2017 complaints and

his protected conduct in 2019. (Id. at PageID.2303–04.)

At first blush, it may appear that Mr. Seals' version of events when compared

with Defendants' borders on fiction, as suggested by WCERS in its reply brief. (*See*

ECF No. 60, PageID.2470.) However, based on a thorough review of the documentary

record and an understanding that Mr. Seals' evidence is largely circumstantial, the court

finds that a genuine issue of material fact does exist as to causation. In so finding, the

court is unpersuaded chiefly by Defendants' temporal proximity arguments. They make

---

[4] Rather than regurgitate Mr. Seals' entire counter-statement of material facts, which
forms the gist of his causation argument, for brevity's sake, the court has selected
particularly salient factual arguments. However, this should not be viewed as an
exhaustive list.

no effort, beyond characterizing the content generally as complaining, to bridge the gap between 2017 and 2019. The court finds it significant that Mr. Seals ceased his public complaints for more than a two-year period. As such, since his pension suspension came within two to three months of his last protected conduct, namely the October 31, 2019 email, a temporal connection exists in Mr. Seals' favor.

However, Mr. Seals has also produced circumstantial evidence to further bolster his claim. Ironically, it is the inferences a reasonable juror could draw from WCERS' delay in reviewing the eligibility of the Clerk's Office position that assist Mr. Seals in surviving summary judgment at this juncture. Per the County's Retirants Returning to Wayne County Employment policy, WCERS would have been notified of Mr. Seal's rehire either in July or August of 2019. (*See* ECF No. 52-2, PageID.1145–49.) However, despite learning of the information by August of 2019, WCERS waited to take action. Based on his deposition testimony, Mr. Van de Grift was not tasked with drafting an advisory opinion until on or around the date of the opinion, which was November 8, 2019 in its initial draft form. (ECF No. 52-5, PageID.1977.) In the interim, Mr. Seals engaged in his protected conduct, which culminated in an email sent by Mr. Kavanaugh to Mr. Grden and Mr. Grysko with the following message: "FYI – sounds like a plan." (ECF No. 58-16.) Coupling this with Mr. Yee's deposition testimony that 90% of the WCERS board seemed upset by Mr. Seals' public comments and that a resolution followed shortly to consider whether Mr. Seals' eligibility under the thousand-hour rule could be withdrawn during a closed session[5], Defendants' argument that they were

---

[5] While the exact date of the Regular Meeting was not established during Mr. Yee's testimony, he did indicate that he departed a closed session once conversations turned towards taking Mr. Seals' money away altogether. (ECF No. 58-5.) Based on the

simply doing a routine review of the thousand-hour rule report is undercut. And while Defendants could counter that a reasonable juror could infer that there was some further delay between their knowledge of Mr. Seals' new position and the actual suspension action, thereby discounting temporal proximity arguments, a juror could reasonably infer some animus from their delay in formalizing a resolution with respect to Mr. Seals' new position, namely that he was left with less than one month's time to decide whether to stop working at the Clerk's Office or continue receiving his pension. While perhaps not individually convincing, the aforementioned collectively sound in Mr. Seals' favor at this juncture, creating a genuine issue of material fact as to causation.

With that said, however, the court's analysis cannot end here. While Mr. Seals has made his requisite showings with respect to WCERS, the same is not necessarily true with respect the County. Here, Mr. Seals alleges a coordinated effort between the County, in various capacities, and WCERS to retaliate against him for his repeated efforts to question WCERS's calculation of pension benefits. (ECF No. 58.) A civil conspiracy involves an agreement between two or more persons (or distinct legal entities) to injure another by unlawful action. *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985). To state a claim for a civil conspiracy to violate a right protected by § 1983 "[a]ll that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Id.* at

---

minutes from WCERS' September 30, 2019 meeting, which reflects Mr. Yee departing from a closed session twenty-one minutes after the start of the session, a reasonable juror could infer that a plan to suspend Mr. Seals' pension for making negative public comments about the WCERS board's handling of pension was born on September 30, 2019.

16

944. The Sixth Circuit has clarified that an "[e]xpress agreement among all the conspirators is not necessary . . . Each conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Id.*

The County presents a strong argument that Mr. Seals' suspension cannot be attributed to any retaliatory animus on its part simply because Corporation Counsel was used to create a legal opinion at WCERS's request. This is underscored further by the fact that Mr. Seals dismissed Mr. Grden from the action, the person who was initially accused of coordinating WCERS's requests for legal opinions with respect to Mr. Seals' pension eligibility. In response, Mr. Seals urges to the court to consider the coordination that had to occur between P/HR and WCERS staff to effectuate his suspension. However, this is entirely undercut by the fact that P/HR initially determined that Mr. Seals was eligible to receive benefits and only changed its position upon being instructed to do by WCERS. Moreover, the Retirants Returning to Wayne County Employment policy expressly requires that P/HR staff be the liaison once WCERS has resolved to suspend an employee's pension plan. (ECF No. 58-9.)

More difficult is whether the Corporation Counsel can be plausibly considered to have "conspired" with WCERS. Part and parcel to this discussion is the appropriateness of the advisory opinion produced, which the court will discuss at length below. However, the facts that would be used to inform a reasonable juror on this issue are not in evidence, largely because they are protected by the attorney-client privilege exercised by WCERS throughout Mr. Van de Grift's deposition. (*See* ECF No. 52-5.) Rather, what has been established, perhaps unsurprisingly, is that two consistent advisory opinions were produced on the issue of Mr. Seals' pension eligibility—one by Corporation

Counsel and one by VMT. Mr. Seals largely relies on Mr. Kavanaugh's "FYI – sounds like a plan" email. Furthermore, the court independently gleans from the record that Mr. Kavanaugh and Mr. Van de Grift were in communication with P/HR staff in reevaluating P/HR's initial decision with respect to Mr. Seals' pension eligibility. (ECF No. 58-19.) However, even when viewed in light most favorable to Mr. Seals, a review of the communications between Mr. Mahlin and Ms. Golden as they prepared to issue P/HR's January 17, 2020 letter to Mr. Seals revoking his pension eligibility leaves the court hard-pressed to plausibly identify animus on the part of Corporation Counsel that was simply performing its function for WCERS.

Mr. Seals alternatively argues that WCERS's "blatant retaliatory animus" can be imputed to Wayne County under a "cat's paw" theory of liability. (ECF No. 58.) "[T]he term 'cat's-paw' refers to 'one used by another to accomplish his purposes.' In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006) (citations omitted). A plaintiff alleging liability under the cat's paw theory seeks "to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011).

"The primary rationale for the cat's paw theory of liability is that, because 'a company's organizational chart does not always accurately reflect its decisionmaking process,' an employee of lower rank may have significant influence over the

decisionmaker." *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 378 (6th Cir. 2017)

(quoting *BCI Coca-Cola*, 450 F.3d at 486). "The ultimate decisionmaker may be

detached from day-to-day operations, and consequently 'apt to defer to the judgment of

the [person] on the spot' and at risk of being 'the conduit of [the lower-level

decisionmaker's] prejudice.'" *Id.* (quoting *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th

Cir. 1990). "As a result, '[a] biased low-level supervisor with no disciplinary authority

might effectuate the termination of an employee from a protected class by

recommending discharge or by selectively reporting or even fabricating information in

communications with the formal decisionmaker.'" *Id.* (quoting *BCI Coca-Cola*, 450 F.3d

at 486). "Given this risk, the cat's paw theory accomplishes two goals. First, the cat's

paw theory addresses situations in which decisionmakers unthinkingly adopt the

recommendations of their biased lower-level supervisors; second, it "forecloses a

strategic option for employers who might seek to evade liability ... through willful

blindness as to the source of reports and recommendations." *Id.*

      The court struggles to apply the cat's paw theory to the facts present at bar. The

same power structure is not in place between WCERS and Corporation Counsel.

Rather, if anything, the reverse is in play, namely that Corporation Counsel serves as

WCERS's subordinate, "to be used in any capacity that would be appropriate for an

attorney, and useful to the System." (ECF No. 52-5, PageID.1967.) In this sense,

Corporation Counsel is a tool for WCERS. While certainly counsel has certain ethical

obligations by which to abide, there have been no allegations that Mr. Van de Grift

acted inappropriately, let alone with retaliatory animus, in producing the advisory

opinion for WCERS. Furthermore, while the court may not agree with the legal analysis

conducted, for reasons explained at length below, incorrectly interpreting the law does not amount to animus without more egregious facts. *See Buddenberg v. Weisdack*, 939 F.3d 732, 737 (6th Cir. 2019) (First Amendment retaliation case wherein the Sixth Circuit Court of Appeals declined to grant a contract attorney's motion to dismiss where the attorney purportedly created a biased report containing "'skewed facts,'… 'flat-out lies,' or… 'downright bizarre and obviously pretextual' [allegations]" justifying discipline by plaintiff's public employer." As such, because Mr. Seals cannot establish causation with respect to the County, and by extension a prima facie case of First Amendment retaliation, summary judgment as to Defendant Wayne County is appropriate.

### B. Whether Pension Suspension Would Have Occurred Regardless

When, as here, the "[Plaintiff] establishes a prima facie case [of First Amendment retaliation], the burden then shifts to [Defendant] to demonstrate 'by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct.'" *Dye*, 702 F.3d at 294 (quoting *Eckerman*, 636 F.3d at 208) (internal quotation marks omitted)). "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id.*

### 1. Review of the Administrative Record (ECF No. 52-4)

At this juncture, one argument remains for the court to evaluate. WCERS[6] contends, as it has throughout the tenure of this case, that its decision to suspend Mr.

---

[6] While WCERS is the only defendant remaining in light of the court's ruling with respect to the causation issue as to the County, given the consistency in WCERS and the County's arguments as to the legal propriety of the decision to suspend Mr. Seals' pension benefits, the court considers both Defendants' arguments on this point.

Seals' pension benefits would have occurred regardless of Mr. Seals' complaints because it was required as a matter of law once he worked over one thousand hours. As WCERS correctly points out, the court's review of the decision to suspend benefits is conducted under a deferential "substantial evidence" standard. *Somberg v. Utica Cmty. Schs.*, 908 F.3d 162 (6th Cir. 2018). Specifically, Michigan law requires the court to determine "whether the decision . . . was supported by competent, material, and substantial evidence on the whole record." *Dignan v. Michigan Pub. Sch. Employees Ret. Bd.*, 253 Mich. App. 571, 576, 659 N.W.2d 629, 633 (2002). WCERS has presented the court with Exhibit Y, titled "Administrative Record," which purports to be the whole record considered by the WCERS board before it resolved to suspend Mr. Seals' benefits.[7] (ECF No. 52-4.)

Notably, missing from the Administrative Record is the legal opinion produced by WCERS' special legal counsel VMT and Mr. Seals' appeal packet, which calls into question whether the court must afford WCERS the deferential review it requests. The court previously warned that it could not conduct a deferential review on a limited record

---

[7] The Administrative Record contains the following: the Regular Meeting minutes from WCERS' May 29, 2020 (ECF No. 52-4, PageID.1813–33); the Agenda Item #6 Resolution (id. at PageID.1834–39); the Retirants Returning to Wayne County Employment policy (id. at PageID.1840–44); the February 14, 2020 "1,000 Hr Report" (id. at PageID.1845–46); the March 16, 2020 "1,000 Hr Report" (id. at PageID.1847–49); the April 16, 2020 "1,000 Hr Report" (id. at PageID.1850–53); the May 11, 2020 "1,000 Hr Report" (id. at PageID.1854–56); the January 17, 2020 letter to Mr. Seals from Steve Mahlin (id. at PageID.1857); emails from P/HR staff to Mr. Seals regarding his hours worked (id. at PageID.1858–62); a "Job Code Table" for the County Clerk position (id. at PageID.1864); the December 9, 2019 Wayne County Corporation Counsel Memorandum titled "Dwayne Seals Redux – Exemption From 1,000 Hour Retiree Limit" (id. at PageID.1865–67); the May 21, 2020 Wayne County Corporation Counsel Memorandum titled "Dwayne Seals – Documents and Supplemental Analysis" (id. at PageID.1868–70); Mr. Seals' Requisition for Personnel (id. at PageID.1871–80); and a Job Code Table for the Register of Deeds position (id. at PageID.1881).

in its denial of Defendants' motions to dismiss. (ECF No. 22) ("The underlying legal analysis reviewed and adopted by the pension board is not yet part of the record at this stage and precedent is clear that the whole record is needed before the court can conduct even a deferential review of the board's determination.") This failure alone would permit the court to forgo a deferential review.

With that said, WCERS did produce two memoranda penned by Wayne County Corporation Counsel. [8] Since Mr. Seals has not disputed that he worked more than one thousand hours in his position with the Clerk's Office, much of the documentation contained within the Administrative Record related to him reaching one thousand hours is more form than substance. Thus, the focus of the court's review should be on these legal memoranda. The thrust of WCERS's argument, as contained in the legal memoranda, is that Mr. Seals' position with the Clerk's Office does not qualify as an elected or appointed county official, which is required to trigger the exemption under Mich. Comp. Laws § 46.12a(28)(b)(i)(B). While the parties supplement the Administrative Record with their own additional documentary evidence and legal argument, the court cannot consider this supplemental briefing. As WCERS indicated, the court's review is limited to the record upon which the administrative agency based its decision. The question before the court, therefore, becomes whether the legal memoranda are substantial, competent, and material, such that WCERS' decision should remain undisturbed. The court concludes they are not.

_____

[8] Though not expressed by WCERS, the court presumes that VMT's opinion has not been produced due to confidentiality reasons. Ultimately, WCERS indicates that both VMT and Corporation Counsel came to the same legal conclusion. Thus, the court is left to merely assume that the substantive analysis was not so different as to warrant a separate submission of evidentiary support for this case.

22

The appropriate test used under Michigan law to determine whether a position qualifies as a "public official" is espoused in *People v. Freedland*, 308 Mich. 449, 457, 14 N.W.2d 62 (1944). The *Freedland* Court formulated a five-factor test, which is as follows:

> (1) It must be created by the Constitution or by the Legislature or created by a municipality or other body through authority conferred by the Legislature; (2) it must possess a delegation of a portion of the sovereign power of government, to be exercised for the benefit of the public; (3) the powers conferred, and the duties to be discharged, must be defined, directly or impliedly, by the Legislature or through legislative authority; (4) the duties must be performed independently and without control of a superior power other than the law, unless they be those of an inferior or subordinate office, created or authorized by the Legislature, and by it placed under the general control of a superior officer or body; (5) it must have some permanency and continuity, and not by only temporary or occasional.

308 Mich. at 457–58, 14 N.W.2d 62.

The memoranda suggest that each of these factors is "indispensable," meaning that every factor must be present to establish a position as being that of a public official. However, in *Dearborn Fire Fighters Union, Local No. 412, I.A.F.F. v. City of Dearborn*, 394 Mich. 229, 309–10, 231 N.W.2d 226 (1975), the Michigan Supreme Court indicated as follows:

> [T]he five *Freedland* criterial may be taken as an all-or-nothing test. We do not believe Freedland should be so read, although some of the language adopted from another jurisdiction seems to so command ('we hold that five elements are indispensable in any position of public employment, in order to make it is public office'—308 Mich. 449, 457, 14 N.W.2d 62, 65). This Court in *Freedland* carefully examined all of the rules not only from the Montana case of *State ex rel. Barney v. Hawkins* with its five elements, but also the observation quoted from Cooley. We concluded:

> "Applying the rules thus stated to the instant case, we are impressed with the fact that defendant neither had the dignity nor the discretion usually vested in one holding a public office." 308 Mich. 449, 458, 14 N.W.2d 62, 65.

> We seem from the language of that conclusion to be relying more heavily on the Cooley quote than the Montana decision. In any event, we hold that the length of

tenure element is a significant but not dispositive factor. For example, the Attorney General might appoint a learned lawyer as a Special Assistant Attorney General and swear him in for one case alone. It would be difficult to say that that Special Assistant Attorney General was not a public officer.

The referenced Cooley quotes is as follows:

The officer is distinguished from the employee in the greater importance, dignity and independence of his position; being required to take an official oath, and perhaps to give an official bond; in the liability to be called to account as a public offender for misfeasance or nonfeasance in office, and usually, though not necessarily, in the tenure of his position. *Throop v. Langdon*, 40 Mich. 673, 682–683 (1879).

*Freedland*, 394 Mich. at 306, 231 N.W.2d 226. Therefore, all five factors are not

necessarily indispensable under Michigan law, though the area admittedly appears

unsettled.

With respect to the first factor pertaining to creation under legislative authority,

after examining Mich. Comp. Laws § 50.131, Mr. Van de Grift opined that Mr. Seals'

Deputy County Clerk/Financial Officer position was not explicitly created by statute,

unlike the positions of chief county clerk and deputy clerks assigned to judges. (ECF

No. 52-4, PageID.1867.) However, this analysis entirely ignores other statutory bases

for Mr. Seals' position, specifically Mich. Comp. Laws § 45.41, which empowers the

county clerk to "appoint a deputy or deputies who may perform all the official acts which

the officer making such appointment might legally do." When read in conjunction with

Mich. Comp. Laws § 45.41, Mich. Comp. Laws § 50.131 appears to be a mandate to

higher county populations. The plain language of *Freedland* does not require a mandate

for a public official position to exist, but merely the appropriate legislative authority.

24

Here, Ms. Garrett was well within her legislative authority to appoint Mr. Seals as her deputy.[9]

With respect to the second factor pertaining to delegation of sovereign power, Mr. Van de Grift concluded that because "a deputy county clerk is not granted more 'sovereign power of government' than any other position within a department" and is not authorized by law to do so, the deputy clerk position is further removed from the sovereign power of the elected County Clerk. (ECF No. 52-4, PageID.1867.) This analysis entirely misses the point. The job description for Mr. Seals' position can reasonably be construed as "a delegation of a portion of the sovereign power" of the Clerk's office to a deputy. *Freedland*, 308 Mich. at 457, 14 N.W.2d 62. The county Clerk's statutory duties include collecting court costs and "render[ing] an accounting to the court of all funds," Mich. Comp. Laws § 600.571, one of the duties delegated to Mr. Seals. (ECF No. 52-4, PageID.1875.)  The job description expressly provides that "the Deputy County Clerk/Finance Officer will oversee and manage the statutorily mandated functions commensurate with the Wayne County Clerk's responsibilities as the Fiduciary Agent for the Third Circuit Court." (Id.) A mere delegation of a portion of the sovereign power is all that is require by *Freedland*.

With respect to the third factor, fourth, and fifth factors, Mr. Van de Grift made this solitary argument:

> Lastly, because a non-judicial deputy county clerk is not created by state law, the third, fourth, and fifth elements fail as well. The duties of a deputy county clerk

---

[9] The issue of Ms. Garrett failing to have her deputy clerks sworn in by a circuit court judge and registered with the county treasurer was not raised within the legal memoranda. As such, the court will not address it, except to reiterate its skepticism that all of Ms. Garrett's appointments are invalid in light of other statutory bases for appointments in larger counties. *See* Mich. Comp. Laws § 45.41.

25

are a function of a job description or employment contract, not statute. These duties are not performed "without control of a superior power other than the law, rather the County Clerk directs and determines the duties of a deputy clerk. A deputy clerk is not a permanent position required by law to exist; rather the County Clerk could eliminate the position at will.

(ECF No. 52-4. PageID.1867.) Again, Mr. Van de Grift misses the mark. Factor three

requires some definition of the duties to be discharged. This is again appropriately

defined by statute, both directly and impliedly, namely with respect to what a county

clerk is authorized to do. *See, e.g.,* Mich. Comp. Laws § 45.41; Mich. Comp. Laws §

600.571; Mich. Comp. Laws § 50.66. Factor four expressly allows for a position in which

duties are performed in the capacity of "an inferior or subordinate office, created or

authorized by the Legislature, and by it placed under the general control of a superior

officer or body." *Freedland*, 308 Mich. at 457–58, 14 N.W.2d 62. The court is hard-

pressed to accept that a deputy county clerk would not be a subordinate office to the

superior county clerk. Finally, the permanency and continuity of factor five is not

determinative, especially in light of the remaining factors. *Dearborn Fire Fighters Union,*

*Local No. 412, I.A.F.F.*, 394 Mich. at 309–10, 231 N.W.2d 226. Mr. Van de Grift failed to

even acknowledge the existence of this relevant case law. With that said, a financial

component to the County Clerk's duties is recognized by statute. *See* Mich. Comp.

Laws § 600.571. Though a chief financial officer deputy clerk is not explicitly required by

statute, the need for some form of financial officer is implicit in the duties of a County

Clerk. As such, some permanency can be derived from Mr. Seals' position.

    In summary, the Corporation Counsel memoranda are analytically flawed, such

that they cannot form the basis of competent, material, and substantial evidence in

support of WCERS' decision to suspend Mr. Seals' benefits. The court therefore need

not give WCERS's suspension decision any special deference.

## 2. Consideration of Remaining Documentary Evidence

Having determined that the Corporation Counsel's memoranda were analytically

flawed, the court still must consider whether WCERS has shown by a preponderance of

the evidence that it would have suspended Mr. Seals' pension benefits, regardless of

his protected conduct. WCERS has failed to make that showing at this stage. Rather,

WCERS rested its entire argument on the legal correctness of Corporation Counsel's

opinion. Without the force of this opinion, however, what remains is Mr. Seals' prima

facie retaliation claim, which survives summary judgment due to the genuine issue of

material fact as to causation. As such, WCERS's motion for summary judgment must be

denied.

## V. CONCLUSION

Mr. Seals has once again alleged just enough facts to survive summary judgment

at this stage on his First Amendment retaliation claim against WCERS only. However,

he failed to establish a genuine issue of material fact with respect to causation in his

case against the County. Accordingly,

IT IS ORDERED that Defendant Wayne County Employees' Retirement

System's motion for summary judgment (ECF No. 52) is DENIED.

IT IS FURTHER ORDERED that Defendant Wayne County's motion for summary judgment (ECF No. 54) is GRANTED.


s/Robert H. Cleland                          /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  November 10, 2022

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, November 10, 2022, by electronic and/or ordinary mail.

s/Lisa Wagner                         /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\EKL\Opinions & Orders\Civil\20-11272.SEALS.MSJ.EKL.docx